James W. **MEISSER**, Plaintiff,

v.

Andrew C. **HOVE**, Jr., Chairman of the Board of Directors of the Federal Deposit Insurance Corporation, Defendant.

No. 91 C 3242.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 21, 1994.

508

Stephen G. Seliger and Clare Marie Kralovec, Seliger & Mikva, Ltd., Chicago, IL, for James L. Meisser, plaintiff.

Jack Donatelli, U.S. Attorney's Office, Chicago, IL and Cassandra N. Jones, F.D.I.C., Washington, DC, for L. William Seidman, Chairman of Bd. of Directors of FDIC, defendant.

## ORDER

LEINENWEBER, District Judge.

The Court having referred this matter to Magistrate Judge Gottschall pursuant to 42 U.S.C. § 2000e–5(f)(5) for the purposes of conducting a trial pursuant to Rule 53 of the Federal Rules of Civil Procedure and Magistrate Judge Gottschall having conducted a trial in this cause and further having conducted a hearing on damages in this cause and having made a recommendation which has been adopted by this Court, it is hereby ordered as follows:

Judgment on liability is entered in favor of the plaintiff and against the defendant on plaintiff's claim under 29 U.S.C. § 791 (§ 501 claim). Plaintiff's claim under 29 U.S.C. § 794 (§ 504 claim) shall be dismissed for the

reasons set forth in Magistrate Judge Gott-schall's Recommended Findings of Fact and Conclusions of Law dated August 24, 1994.

It is further ordered with respect to the remedy in this case that:

1. Plaintiff shall be upgraded effective November 1, 1994, to a Grade 13, Step 5.

2. Plaintiff shall be awarded backpay in the amount of $54,522, which includes pre-judgment interest. The FDIC shall deposit 5% of this amount directly as retroactive contributions into plaintiff's 401(K) account and 7% of this amount directly as retroactive contributions into plaintiff's CSRS pension account.

3. The FDIC shall make all reasonable accommodations necessary to assist plaintiff in performing his current job functions and to ensure that plaintiff receives training and experience that will help him advance within the FDIC.

4. Commencing no later than the date of entry of this order, the FDIC shall provide plaintiff with developmental opportunities and training in the areas of complex exami-nation skills and capital markets to equip plaintiff to compete meaningfully for a Grade 14 position. If reasonable accommodations can allow plaintiff to develop his skills in these areas more effectively, such accommo-dations shall be provided. The following FDIC officials shall have primary responsi-bility for developing a training program for plaintiff, for monitoring its effectiveness and for ensuring that necessary accommodations are made: Field Office Supervisor Michael E. Apolzan, Assistant Regional Director Thomas J. Wochos, Review Examiner Sherry Gilloffo and Customer Service Representa-tive H.S. (Tuck) Ackerman. The training opportunities to be made available to plaintiff shall include but not be limited to the follow-ing:

a) The FDIC shall send Mr. Meisser to the February 27, 1995 Capital Markets por-tions of the Financial Institutes Analysis School in Washington, D.C.

b) The FDIC shall send Mr. Meisser to the Commissioned Examiner Course in Washington, D.C., the week of March 6, 1995.

c) The FDIC shall send Mr. Meisser to an additional one-week class, provided plaintiff identifies a suitable course being offered at some time during the first year after entry of this order.

d) The FDIC shall provide Mr. Meisser a detail to the field in the Chicago area where he can obtain experience consistent with the court's order that he be given developmental opportunities. During this detail, any appro-priate reasonable accommodations shall be provided to ensure that plaintiff receives maximum developmental benefit from this field experience. Plaintiff's regional office position will remain open to him.

e) The FDIC shall provide the opportuni-ty, at some point during the first year follow-ing entry of this order, for a professional evaluation of plaintiff's speech to determine if a refresher course of speech therapy is likely to be beneficial. If the evaluation indicates speech therapy would be beneficial, plaintiff shall be given the opportunity to attend speech therapy once a week for approximate-ly six to eight weeks. If feasible, this evalua-tion and therapy should be performed under the supervision of Dr. Garstecki of North-western University. The purpose of any such speech therapy is to help Mr. Meisser speak in a manner more readily understanda-ble by hearing people. Speech therapy need not be undertaken if it is unlikely to make any appreciable difference in the clarity of plaintiff's speech.

5. No less frequently than every six months during the period from November ——, 1994 to May ——, 1996, the parties shall report to the Court on the opportunities which have been provided to plaintiff to pre-pare him to seek Grade 14 status. The Court may extend this eighteen-month peri-od of court supervision if necessary and ap-propriate. The first status hearing pursuant to this order shall be before Judge ——————— on April ——, 1995 at ———— a.m.

6. Plaintiff's counsel shall submit a peti-tion for attorneys' fees within 10 days of entry of this order.

*RECOMMENDED FINDINGS OF FACT
AND CONCLUSIONS OF LAW*

GOTTSCHALL, United States Magistrate Judge.

This is an action brought by plaintiff against the acting director of the Federal Deposit Insurance Corporation (hereinafter, this party will be referred to as "FDIC") for handicap discrimination in promotion under the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794 (hereinafter, §§ 501 and 504 respectively). Plaintiff has exhausted his administrative remedies.

Plaintiff, who has been profoundly deaf since birth, is a lip reader rather than a signer. After special classes in elementary school, he was mainstreamed in junior high school, high school and college. He graduated from the University of Wisconsin–Whitewater with a degree in Business Administration (majoring in finance) with 12 credit hours in accounting. While at college, plaintiff played varsity football for four years. Although plaintiff has never been able to hear, he has learned to speak. His speech, which lacks normal inflection, is difficult to understand until one becomes well accustomed to it (plaintiff is understandable, but understanding requires some effort on the part of the listener). Plaintiff is an excellent lip reader and understands spoken language readily, as long as the speaker faces him. The expert opinion introduced at trial indicates that plaintiff is at the high end of oral intelligibility for a deaf person.

Plaintiff was hired by the FDIC effective January 12, 1981, with a temporary (700 hour) appointment under Schedule A for a handicapped individual, as a GG–570–5 (Step 8) Bank Examiner (Trainee) and assigned to the FDIC's Wausau, Wisconsin field office in the Madison Region. (DX A.) Effective August 12, 1981, plaintiff's appointment was converted to a permanent appointment. The conversion form states, "The supervisor indicates subject is progressing satisfactorily." (DX B.) Plaintiff progressed through routine promotions to Assistant Bank Examiner GG–7 (December 1981) and GG–9 (January 1983). (DX C, D.)

Throughout his career, plaintiff has received evaluations in the "2" or "3" rating category with an occasional "1." A "2" rating means "The employee's performance is well above what is acceptable and you would recommend him/her without hesitation for another position in which this item is especially important." A "3" rating signifies "The employee's performance is entirely acceptable and you would expect the same capable performance in another position." A "1" rating signifies "The employee's performance demonstrates a competence deserving special mention" and requires the evaluator to list specific examples. Plaintiff's evaluations throughout suggest a mix of strong areas and areas needing improvement, with an indication of strong analytical and computer skills and a high level of responsibility, diligence and timeliness. Some need for improvement in written communication is noted from time to time. From the beginning, however, it is clear that the evaluators were worried about plaintiff's oral communication abilities. For instance, in plaintiff's first evaluation, January 12, 1982, this comment appeared:

Communication problems relating to hearing impairment will continue to present a problem in this type of work but, to date, no significant difficulty has been encountered. Mr. Meisser will have to rely primarily upon *written communication* to function as an examiner and his effectiveness will depend upon his particular skills in this area. The most difficult problems in communication will involve group discussions often required in examination activities.

A year later, this comment appeared:

Hearing impairment has not presented an insurmountable obstacle to Mr. Meisser in development during this phase of examination work. He has been able to substitute other communicative skills in performing the required duties to date. The most difficult communication problems will be encountered in the area of loan evaluation where group discussions are often required.

The same evaluation also noted:

Subject works very well with other coworkers and bank personnel. He enjoys

working with other people and possesses an outgoing type of personality which is beneficial to job related and non job related activities.

In the January 1984 evaluation, this comment appeared:

Jim has been deaf since birth, and as a result his speech may prove difficult for some to fully understand what is being communicated. Communication will always be difficult for Jim in dealing with bankers; however, from past experience this problem is not of such a serious nature that it will prohibit Jim from performing the full functions of a bank examiner. He has addressed meetings with the bank's board of directors, and has held loan discussions. Writing is largely confined to Report of Examination page 1 and page A comments, and other narrative comments in the Report of Examination. Jim's writing skills are at an acceptable level and are improving with experience in report writing. Jim utilizes lip reading, and this skill requires periodic updating. This will require assignment as needed to large metropolitan areas where such training is available. One two week assignment to Milwaukee was arranged in 1983, and a similar assignment is anticipated in current year.

In the January 1986 evaluation, a significant change appeared. Whereas formerly, in the portion of the evaluation rating ability to address groups formally, plaintiff had consistently received a "3" rating, he now received an "x," signifying, "The employee had a limited opportunity to show ability in this respect." The relevant comment was as follows:

As noted, written report comments, loan write-ups, and visitation findings have been prepared satisfactorily; needed redrafting of written comments is more a lack of experience than any deficiency in writing skills. Oral communication skills have obvious expected inadequacies, but not to the extent they hinder Jim's assistant examiner performance. Given a short adjustment period, people have been able to orally communicate with Jim in an effective manner, including both fellow examiners and bankers. However, Jim would clearly be at a disadvantage in communicating findings of an examination to a board of directors or in discussions of sensitive issues with hostile management. Discussion of complicated matters would also likely pose a problem. Jim is presently undergoing speech therapy sessions and, while not likely to show significant improvement in the short run, should be beneficial over the long term.

In 1987, plaintiff received a "3" in ability to address groups formally. The accompanying comment was as follows:

Jim has been deaf since birth. He is an exceptional lip-reader and can usually understand what is being said by individuals, but at times his speech can prove difficult for some to fully understand what is being communicated. Jim has been taking speech therapy lessons since arriving at the Chicago North office and is readily understandable among coworkers, but the listener is required to pay close attention when Jim is talking. This situation does create some obvious oral communication difficulties, but most of the problems have been minimized with Jim providing very detailed agendas for board meetings and instructing people to listen closely. Although some impatience has been noted among selected directors at board meetings, the meetings Jim has conducted have gone very smoothly. In more sensitive or problem situations, hostile board reaction to issues would likely pose a communication problem; a second examiner has always attended Jim's meetings in the event problems or questions arise, or if further explanation of issues is needed. The content of Jim's written work has been satisfactory, although several grammatical or punctuation changes have been needed on initial reports. Written work is hampered somewhat by Jim's hearing deficiency as he does not have the luxury of hearing daily conversations and must concentrate on techniques when preparing written comments. While Jim's hearing deficiency can be characterized as an inconvenience to both him and those he is conversing with, as well as requiring some special

considerations in terms of staffing and assignments, it has not proven to be an overwhelming obstacle to the successful completion of Jim's function as an examiner. He has thus far handled oral and written communication situations in a satisfactory manner for initial assignments. While his first examinations have not been without areas of criticism and concern, exposure to more hostile or problem situations will be taken slowly and cautiously.

In 1988, plaintiff's communication skills were rated at "3." The accompanying comment stated:

Mr. Meisser is totally deaf. Through his considerable efforts, he has developed his verbal skills to the point where he can clearly communicate with his co-workers without much difficulty. Written reports have been satisfactory. Mr. Meisser has been assigned a small number of lengthy written analyses. These have improved in quality over time.

The 1988 evaluation noted that plaintiff "has developed a great deal of respect within the FDIC and was named the FDIC Handicapped Employee of the Year at the December, 1987 awards ceremony." A second-level supervisory review comment by Paul Rooney, the Regional Director, stated, "We are very pleased with Mr. Meisser's performance in his new position [Financial Analyst GG 12], and he exhibits strong ability to advance in the financial analysis field. A pleasure to have on our staff!"

The 1989 evaluation was similar to those that preceded it with a "3" rating on communication skills. Plaintiff received a "1" in working relationships outside the immediate organization. The second-level supervisory review note, this time by the Deputy Regional Director, stated:

Jim has progressed in a most satisfactory manner. His work products are entirely acceptable *and* he is a people person who has won the respect of the entire Regional Office staff. It is a pleasure to have Jim in the office.

The January 1990 evaluation was similar. In January 1991, however, the "x" rating for ability to address groups formally reappeared, with the note that "Mr. Meisser's primary contacts are with other members of the Regional Office staff. He communicates well with them; however, clarity of verbal expression with outsiders can be a short term problem." The "x" rating reappeared on the January 1992 evaluation, as well as in 1993. (All evaluations are at PX 57.)

A 1985 performance assessment of plaintiff's performance in a field examination of the Broadway Bank generally praised plaintiff's performance and contained this statement:

Another noteworthy comment concerns Jim's oral communication ability. I asked several bank officers, at the conclusion of the examination, how well they understood Mr. Meisser. The officers indicated that he was difficult to understand at first, but they quickly learned to listen more carefully and then understood him well. Since I have been working with Jim, I have also become more accustomed to his speech, and find that his oral communication is satisfactory.

(PX 58.)

Another 1985 performance assessment by another examiner praised plaintiff's performance in an unusually complicated matter involving the DeKalb Bank and stated:

I thought you also might be interested in Mr. Meisser's communications performance as well. It should be noted that Mr. Meisser's performance of the loan analysis page and schedules was done jointly with an examiner of the Federal Reserve Bank; in fact, Mr. Meisser provided her with her first training in this schedule and analysis. Based on my observations and the comments of Federal Reserve personnel, Mr. Meisser had no significant problems in communicating verbally. I feel he was quite effective in training this other examiner and could do so again with anyone willing to concentrate and work with him.

Verbal communication with bank personnel also appeared to be no problem, again based upon my observations and the comments of other examiners on the job. In fact, a vice president of the bank remarked to me that Mr. Meisser was "an amazing

individual and a very knowledgeable examiner," an evaluation with which I would concur. There are obviously slight communication problems when dealing with Mr. Meisser verbally, but with an understanding of the problem and an initial adjustment period, I did not find them to be insurmountable.

(PX 58.)

In May 1986, another examiner praised plaintiff's performance as examiner-in-charge at a Lake View Bank examination and commented:

I did not attend any management meetings held by Jim to evaluate his communication abilities, but VP Roubitchek was complimentary on Jim's handling of the installment department review at the report wrap-up meeting.

(PX 58.)

In mid–1985, the Wausau office closed, and plaintiff was transferred, as an assistant bank examiner GG–9, to the Chicago North Field Office. His supervisor was Thomas Wilkes. Shortly after he was transferred to Chicago, plaintiff was scheduled to take the FDIC Assessment Center test to be promoted to the status of GG–11 commissioned bank examiner. In this examination, bank examiners seeking promotion appear in Washington, D.C. for a three-day test, which, among other things, involves oral communication, job simulation and roleplaying. On May 20, 1985, prior to the administration of the assessment center test to plaintiff, Bill Houston, Assistant Director of the Assessment Center, wrote to Paul Fritts, the Regional Director, expressing concern that the assessors, who were unfamiliar with plaintiff's speech, might have difficulty understanding him. Houston suggested certain modifications in the testing procedures in order to "create an atmosphere which is as consistent as possible with the manner in which Mr. Meisser functions in the field while at the same time maintaining a true assessment of his ability to get the job done." Specifically, Houston suggested instructing all role players to face plaintiff and enunciate clearly, eliminating the telephone exercises and substituting other means of conveying the information usually provided by telephone, and

lengthening the time periods allocated for oral communication. It was also suggested that an examiner familiar with plaintiff's speech accompany him to aid in clarification as required. Fritts commented in a note on the bottom of the memorandum, "I agree with the thrust of this memo but just how far do we want to go?" (PX 13.) The suggested modifications apparently were not made.

Plaintiff took the Assessment Center test on or about July 26, 1985, and failed. Some deficiencies were noted in his written communication, particularly with regard to syntax and punctuation. However, the main cause of plaintiff's failure was perceived weakness in oral communication on account of his deafness, in that panelists had difficulty understanding him. (PX 17, 57(e); DX H.) (Plaintiff consistently lost points on the basis of weaknesses in verbal interaction with others.)

In a letter dated August 21, 1985, Regional Director Fritts informed plaintiff of plaintiff's failure of the Assessment Center test, and suggested that plaintiff "seek to improve both oral and written communication skills by undergoing extensive speech therapy, and by enrolling in a correspondence writing course." The FDIC offered to "assist in th[e]se endeavors." Plaintiff was told that Field Office Supervisor Wilkes would "follow his progress closely during the next few months." Fritts stated, "Should written and oral communication skills be determined to be sufficiently enhanced for Mr. Wilkes to recommend reevaluation by the Assessment Center, this office will reschedule you for the Regional Office evaluation, and proceed according to the results thereof." (PX 16.)

Plaintiff accepted Fritts' suggestions. He bought books and worked on his writing at home. He began speech therapy at Northwestern University, at the expense of the FDIC, on November 13, 1985, continuing through March 16, 1987. Each progress evaluation from plaintiff's therapist noted improvement and recommended further therapy. (PX 15.)

Plaintiff worked on his speech but heard nothing from his supervisor, Wilkes. Finally, after approximately six months of speech

therapy sessions, plaintiff asked Wilkes what was going to happen. Wilkes suggested that plaintiff write to Fritts. On April 28, 1986, plaintiff reported to Fritts on the progress of his speech therapy and asked when he could be considered for commissioned examiner status. (PX 18.) Although plaintiff had been told that Wilkes would monitor his therapy with a view toward when plaintiff's speech would be improved enough to justify retaking the Assessment Center test, Wilkes testified at trial that while he was plaintiff's supervisor, he was not involved in monitoring plaintiff's progress.[1]

Fritts wrote to plaintiff in response on May 9, 1986, referring him back to Wilkes, who had professed complete lack of involvement in monitoring plaintiff's progress:

> A letter from this office dated August 21, 1985, set forth our intentions in this matter. . . . As indicated in that letter, when your Field Office Supervisor, Thomas Wilkes, has determined that your written and oral communication skills have improved sufficiently, in his judgment, to warrant a recommendation of reevaluation, you will be rescheduled for a Regional Office review. If your Regional Office performance is satisfactory, you will be rescheduled for the Assessment Center evaluation in Washington.

(PX 19.)[2]

At about this time, plaintiff went to Washington for a scheduled training session. One of the speakers was Mr. Michael Hovan, Associate Director of the Division of Supervision in Washington. After the lecture, plaintiff approached Hovan and told him of his efforts to be promoted. Hovan agreed to look into the matter and asked plaintiff to meet with him the next morning. At the meeting, Hovan told plaintiff that plaintiff's treatment appeared to have been unfair and

that he would let plaintiff know what would happen within the month. After plaintiff provided Hovan with additional information, Hovan on June 30, 1986, informed plaintiff that he had been promoted. (PX 20, 21.)

After becoming a commissioned examiner, plaintiff was able to sign examination reports, but his duties did not significantly change. He continued to conduct primarily routine safety and soundness examinations. Other examiners, however, were doing more varied and complex examinations such as compliance, civil rights and electronic data processing examinations, as well as being sent on special assignments and training other examiners. As other examiners enhanced their experience in these ways, they were promoted. Plaintiff legitimately grew concerned about his ability to advance.

At trial, Wilkes testified that he believed that plaintiff would have difficulty functioning as a field-examiner-in-charge, at least without other FDIC employees being present, due to the communication problems his hearing impairment created. While plaintiff was assigned to be examiner-in-charge on a few occasions, his disability had an impact on the FDIC's willingness to assign him difficult and complex work. For instance, Mr. Wilkes testified that he would not give plaintiff an assignment where it was anticipated that there would be a significant hostile reaction from a bank's board of directors. Michael Hovan testified at trial that it would be very difficult for a deaf person to advance as a field examiner because the examiner's job requires a high level of oral communication. The more complex the institution being examined, the greater the importance of oral communication skills. Plaintiff was not informed that his supervisors believed his potential as a field examiner to be so limited.

---

1. Plaintiff was unaware that the August 21 "Fritts" letter was in fact written by Richard Harris, an FDIC review examiner. Harris testified that he monitored plaintiff's progress in speech therapy, looking for plaintiff's speech to improve to the point where people could understand him without extreme concentration. Harris testified that while he was able to understand plaintiff adequately, the information he received from others was that they continued to find plaintiff's speech difficult to understand.

2. Wilkes testified that typically, when an examiner fails the Assessment Center test, there is a one year wait to retake it, during which time the examiner is monitored by his/her supervisor and the supervisor makes a recommendation as to retesting. No one from the FDIC explained why this procedure was not followed in plaintiff's case.

Nevertheless, it was clear to him that he was not getting the kind of opportunities he needed to advance, and that he was falling behind his peers.

Plaintiff spoke of his concerns to Paul Rooney, Regional Director, who told plaintiff that working off-site, as a financial analyst rather than a field examiner, would be a better use of plaintiff's talents and would avoid communication problems in the field. Rooney also told plaintiff that if he developed experience in the financial analyst position, he should be able to move into a SBA (Senior Banking Analyst) position in two or three years. Plaintiff asked Wilkes if he could go to the regional office on a detail to do off-site monitoring, and on March 24, 1987, Rooney informed plaintiff that he had been selected to complete a 60–day detail to the Regional Office to assist Senior Banking Analyst Kowalski as a financial analyst in the Bank Analyst Unit. Rooney's letter stated, "This action reflects quite favorably upon you and represents a follow-up of our prior conversation to address your desires and objectives in rounding out your career potentials." (PX 23.) Plaintiff was rated as a financial analyst grade 12 when he entered upon this detail. On May 26, 1987, Rooney extended plaintiff's detail for an additional sixty days and stated, "We would like to acknowledge our satisfaction with your efforts during your initial detail. You have quickly assimilated the duties assigned and have made productive use of your time." (PX 24.) Shortly thereafter, Mr. Rooney nominated plaintiff for the FDIC handicapped employee of the year award. Plaintiff received the award. (PX 23(a).)

Rooney left as Regional Director around the end of 1988. He was replaced by George Masa.

Promotions among commissioned bank examiners typically involve a posting process.[3] Each position has a grade level, and employees at that level or at the level immediately below it may compete for the position. Sometime in 1988, plaintiff, who was at grade 12, posted for a position graded 13/14. The position was eliminated. In 1989, plaintiff posted for a newly-created position as an SBA in the thrift area; he was found qualified for the position by the Office of Personnel Management but was not selected. Plaintiff was informed that the person selected, Mr. Serna, had extensive specialized experience in the thrift area and that plaintiff should be patient, a response which plaintiff accepted.

At the end of 1989, on December 18, George Masa, then Regional Director, wrote to Paul Fritts, then Director of the Division of Supervision, requesting that plaintiff's position be upgraded from GG 12 to GG 13. An attached supporting memorandum from Lawrence Kowalski, plaintiff's supervisor, explained plaintiff's duties and stated as follows:

> During the past two plus years, Mr. Meisser has been given increasing responsibilities. He has been exposed to all functional areas of the SBA Unit. Assignments have been completed in a highly satisfactory manner. His analytical and writing skills have steadily progressed. He is able to identify key issues and address them in written reports. Further, Mr. Meisser is a diligent worker who makes effective use of his time.
>
> Mr. Meisser eagerly volunteers for new assignments and is interested in developing new and better approaches. For example, in late October, he attended an IDEAL programming school in Washington. Because of that training, he was able to design a complex program which generates a succinct, comprehensive, financial report which we are using to screen GMS exceptions. This newly designed tool greatly facilitates individual bank reviews and will result in significant time savings. For his efforts, he received a Special Service Award in September 1989 under the 4% Incentive Awards Program.
>
> In conclusion, Mr. Meisser's work is substantial and important to the smooth functioning of the Unit. As time has past [sic], I have delegated an increasing amount of work to him, thereby freeing my own time. It is recommended that Mr. Meisser's posi-

**3.** Mae Culp, Director of the FDIC's Office of Equal Employment Opportunity, testified that the FDIC can waive competitive posting as an accommodation.

tion be upgraded to a GG 13 in recognition of his significant responsibilities and accomplishments. Assistant Regional Director Raymond Brennan has reviewed this recommendation and concurs.

(PX 32.)

Had plaintiff's position been upgraded, he would have been able to advance within the FDIC without being placed in a position where his deafness was an impediment. The upgrade request reflected the view of the Chicago office that Meisser was performing important work at a level higher than his grade level. However, in May 1990, the upgrade request was turned down. Plaintiff was informed that Hovan rejected the upgrade request on the grounds that if plaintiff's position were upgraded, all financial analyst positions would have to be upgraded. The evidence at trial, however, failed to provide support for this position, but rather indicated that such upgrades have occasionally, albeit rarely, been allowed.

In February 1990, two SBA positions were posted in plaintiff's region. They were posted not at grade 13/14 [4] but at GG 14. (PX 33.) As a result, plaintiff was ineligible to apply for them. A Mr. Weier and a Mr. Feeney were selected for these positions.

Plaintiff was informed that if he wanted a GG 13 position, he should post for a position in the field. The suggestion was made despite the difficulties plaintiff had previously encountered trying to advance in the field and with no suggestion as to how such difficulties could be avoided in the future. Plaintiff was by this point additionally concerned that he was not qualified for a GG 13 examiner position in the field since he had only one year of commissioned examiner experience and had been devoting his energies to off-site monitoring. Plaintiff was advised that he could post for a position elsewhere in the country but he felt that he could not do that because of his wife's career.

At about the time that plaintiff's upgrade request was turned down, certain of plaintiff's duties, involving bidders' lists and brokered deposits, were transferred to the new GG 14 SBA's, Weier and Feeney. Feeney took over analyzing brokered deposits because the program was being reorganized and would involve more telephone usage. Plaintiff took responsibility for analysis of large banks or bank holding companies along with the two new SBA's and his supervisor, Kowalski. The smaller entities were divided among plaintiff and the two new SBA's, with plaintiff having more of the smaller ones. Plaintiff, concerned that he was not getting the opportunity to enhance his experience, asked Kowalski if he could have more of the larger companies. He was told to be patient.[5]

In 1989, during the thrift crisis, some personnel from the regional office were sent on details. Plaintiff requested a detail but was told by Kowalski that he had too much to do in the office. Indeed, plaintiff was extremely busy, although much of his work was of a type that had become routine for him. In essence, plaintiff was being burdened with large quantities of low-level work and was being given little opportunity to demonstrate his ability to handle more complex projects.

When plaintiff learned that he could not get a position upgrade and when the SBA positions in his region were posted at GG 14, making him ineligible for them, plaintiff filed an EEO complaint. There was a voluntary resolution of the complaint in that plaintiff was promised that the next position would be

---

4. The positions could have been posted at GG 13–14, allowing GG 12's to apply, but a decision was made to post at GG 14.

5. The record contains a memorandum from Masa to Hovan complimenting plaintiff's analysis of the region's small banks. The memo is obviously intended to recognize plaintiff's excellent performance but it also gives support to plaintiff's concern that he was being given assignments that did not allow him to demonstrate his ability to do more challenging work:

FYI—this was just completed so I thought it would not hurt to send you a copy. It is the kind of detailed report which Jim Meisser *routinely* puts together in a thoroughly satisfactory manner. Because it and others of his reports concentrate on the *many small banks* in this region, much of such work is thankfully taken off the shoulders of our GG–14 SBA's who are involved in more substantive large bank reports and review, complex accounting issues, etc. Keep or discard as you feel appropriate. (PX 35. Emphasis in exhibit as introduced; source of emphasis unknown.)

posted at GG 13–14 and if he was not selected, he would receive counselling. (DX AO.)

Plaintiff applied for the next position. He was found qualified for it but was not selected. He received a counselling session with Messrs. Masa, Regional Director, and Brennan, Assistant Regional Director. He was told that his work was significant and very good, but that to advance, he would have to go back to the field as an examiner and take speech therapy and a writing course. Plaintiff declined these suggestions and another meeting was scheduled.[6] At the second meeting plaintiff asked Mr. Brennan what kind of a training program was recommended and was told that he should come up with his own training program. Thereafter, plaintiff filed this lawsuit.

Since the filing of the lawsuit, another SBA position was announced. Plaintiff was found qualified and posted for the position. He was not selected.

The persons selected over plaintiff for the various positions for which he has applied appear qualified for the positions in question and reasonable arguments were made by the defense as to why the person selected in each instance was chosen over plaintiff.[7] But plaintiff's inability to acquire the experience his competitors had to offer stemmed directly from the limitations of the work he was assigned, which in turn stemmed from his supervisors' concern about plaintiff's oral communication skills. As a result, plaintiff has fallen increasingly behind his peer group in his career advancement despite his obvious talent, drive and dedication.

## CONCLUSIONS OF LAW

Plaintiff brings this action under sections 501 and 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794. The weight of authority in this district indicates that § 501 is the exclusive remedy for federal employees. *See Brill v. Derwinski,* No. 92 C 4490 (1993 WL 199052) (N.D.Ill. June 9, 1993); *Overton v. Reilly,* No. 90 C 412 (N.D.Ill. August 13, 1993). *See also McWright v. Alexander,* 982 F.2d 222, 225 (7th Cir.1992); *Boyd v. United States Postal Service,* 752 F.2d 410, 413 (9th Cir.1985). While the court finds these authorities reasonably persuasive, they do not provide a comprehensive account of the interplay of the relevant sections of the Rehabilitation Act. The parties' briefs address this issue only superficially. The § 504 claim will be dismissed, but leave will be given to plaintiff to seek reconsideration of this issue if he wishes, pursuant to the procedure described at the conclusion of this opinion.

Section 501 "imposes an affirmative duty upon federal agencies 'to structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion.'" *McWright v. Alexander,* 982 F.2d 222, 225 (7th Cir.1992) (citations omitted). The Seventh Circuit has indicated that the "affirmative action" language in § 501 means, as it implies, that § 501 imposes a duty beyond evenhanded treatment. *Id.* at 226. Section 501 requires that federal agencies make a more active and affirmative effort to eliminate barriers to employment of the handicapped than mere nondiscrimination. *Mantolete v. Bolger,* 767 F.2d 1416, 1422 (9th Cir.1985).

Regulations promulgated under § 501 require such federal agency to be a "model

---

6. The court was satisfied by the evidence at trial that while speech therapy could work small, although usually temporary, improvements in plaintiff's speech, speech therapy would not render plaintiff's speech materially more comprehensible to untrained listeners. Plaintiff, by this time married, was being coached in his speech regularly by his wife, who is not hearing-impaired. While the court does not know whether the FDIC officials had actual knowledge that plaintiff could not be materially aided by therapy, their inattention to his progress on the first round of therapy, as well as their failure to seek expert guidance as to what improvement could be expected from therapy, suggests to the court, and certainly must have suggested to plaintiff, that the speech therapy suggestion was at least as much a means of postponing the issue of plaintiff's advancement as a serious attempt at an accommodation.

7. Plaintiff's evaluation scores in many cases were comparable to the persons with whom he competed for promotion and who were selected in preference to him. Defendant's arguments in most instances focused on these other persons' more specialized experience.

employer of handicapped individuals," 29 C.F.R. § 1613.703. The regulations also impose an obligation on the agency to make reasonable accommodations to the handicapped employee's known physical limitations "unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 29 C.F.R. 1613.704(a).

The regulations, according to the Seventh Circuit Court of Appeals, "give a prominent role to the task of accommodation." *McWright v. Alexander*, 982 F.2d 222, 226 (7th Cir.1992). Indeed, the regulations specify a sampling of types of accommodation that may be required:

> Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

29 C.F.R. § 1613.704(b).

The regulations also provide:

> In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) the overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's workforce; and (3) the nature and the cost of the accommodation.

29 C.F.R. § 1613.704(c).

The United States Office of Personnel Management ("OPM") defines the term "reasonable accommodation" in its *Handbook of Reasonable Accommodation* as "a logical adjustment made to a job and/or the work environment that enables a qualified handicapped person to perform the duties of that position." (PX 86, p. 2.) The OPM Handbook sets forth examples of reasonable accommodations including modifications of written examinations, modification of worksites, making facilities accessible, adjusting work schedules, restructuring jobs, providing assistive devices, providing readers and interpreters, adoption of flexible leave policies, reassignments and retraining employees, and eliminating transportation barriers. (PX 86, 89.)

The government's *Guide for the Employment of the Handicapped and Disabled Veterans* requires federal agencies to make "reasonable accommodation" for the handicapped "unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program." The factors to be included in considering the issue of the existence *vel non* of undue hardship are "[t]he overall size of the agency with respect to the number of employees, number and type of facilities, and size of budget[,] [t]he type of operation, including the composition and structure of the work force[,] and the nature and cost of the accommodation needed." (PX 90, p. 11.) The Guide provides:

> Job restructuring is one of the principal means by which qualified handicapped workers can be accommodated. The idea is to identify factors which make a job incompatible with a worker's handicap and, if possible, eliminate them so that the capabilities of the person may be used to the best advantage. Job restructuring does not alter the essential function of the job. Rather, any changes made are those which enable the disabled person to perform these functions. This sometimes involves changing job content by isolating and eliminating nonessential duties through reassignment. Often, however, job modification is a matter of slightly altering the method of task accomplishment.

(PX 90, p. 18.)

The Office of Personnel Management has also published a *Handbook of Job Analysis for Reasonable Accommodation*, which provides:

> A reasonable accommodation is an adjustment made in a job and/or the work environment that enables a qualified handicapped person to perform the duties of that position. The types of accommoda-

tions which can be made are numerous and may include: worksite modifications; adjusting work schedules; restructuring jobs; acquisition or modification of equipment or devices; providing interpreters, readers, or personal assistants; and reassigning or retraining employees.

When planning accommodations it is important to remember that accommodations are highly individualized and what may have been successful for one disabled person may not be appropriate or necessary for another. This holds true for individuals with the same or similar disabilities. In each case the need for an accommodation and the functional problem(s) precipitating this need must be clearly identified and understood before appropriate planning of accommodations can take place. This involves analysis of the known abilities and limitations of a disabled individual with respect to the functional requirements of a particular job and the nature of the work environment in which the job is performed. A job analysis is crucial and makes this possible.

"Job Analysis," simply defined, is the process by which information relative to a specific job, position, or occupation is collected, analyzed, and interpreted. With respect to reasonable accommodation, it is the essential process through which accurate and complete information about the functional job requirements of a particular job and the nature of the work environment can be identified. A comparison of information collected through a job analysis process to information on the functional abilities and limitations of a disabled individual provide the basis from which potential problems can be identified, understood, and appropriate accommodations planned.

(PX 87, p. 1.) The FDIC acknowledges that it has never conducted a job analysis respecting plaintiff.

■ In a case of this nature, the burden of proof lies with the employee to establish that the federal agency has discriminated against him in violation of § 501. *See Texas*

*Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). As in other discrimination cases, the courts have adopted a burden-shifting order of proof. Plaintiff may establish a *prima facie* case based on failure to accommodate a handicap by showing: (1) that he is handicapped and the employer was aware of the handicap, (2) that he is otherwise qualified for the position, and (3) that the employer failed reasonably to accommodate the handicap. *Williams v. Casey,* 691 F.Supp. 760, 767 (S.D.N.Y.1988). Once the plaintiff has successfully established his *prima facie* case, the burden of production shifts to the agency to introduce evidence either that it has reasonably accommodated the employee's needs or that further accommodation would create an undue hardship. *Gallagher v. Catto,* 778 F.Supp. 570, 577–578 (D.D.C.1991), *aff'd,* 988 F.2d 1280 (D.C.Cir. 1993). Plaintiff must then rebut defendant's evidence of reasonable accommodation or undue hardship if he is to prevail. *Id.* at 578.

■ It is not contested that plaintiff is handicapped and that defendant was aware of his handicap. Further, plaintiff's evaluations establish that except in abilities directly affected by his handicap, particularly oral communication, he performed very well, and his overall performance was at all times satisfactory, even where oral communication was essential. Indeed, on numerous occasions he was found qualified for advancement to a higher posted position but was not the individual selected. It is thus clear that plaintiff was otherwise qualified for his position.[8] Finally, plaintiff's long, difficult and ultimately unsuccessful attempt to progress, despite his obvious abilities, makes clear that his handicap has not been accommodated, either by upgrading his position or, despite his repeated requests, by assisting him in finding assignments that would equip him to compete more effectively for promotions. The court thus finds that plaintiff has satisfied the elements of the *prima facie* case.

Having so determined, the court turns to the issue of whether the defense has pro-

---

8. Defendant agrees that "Mr. Meisser could perform the essential functions of the job with reasonable accommodation." *Defendant's Proposed*

*Findings of Fact and Conclusions of Law,* p. 30, # 28.

duced evidence either that it has reasonably accommodated plaintiff or that further accommodation would cause undue hardship. Defendant did make some accommodations for plaintiff, such as getting him special telephone equipment (PX 7) and paying for speech therapy. But it is clear that neither of these accommodations was sufficient to help plaintiff in his quest for advancement.

It could be concluded on this record that defendant also produced some evidence that further accommodation would be burdensome in the concern expressed that upgrading plaintiff's position would lead to the need to upgrade other positions, and in the evidence that people chosen over plaintiff for the positions for which plaintiff posted had qualifications viewed as desirable which plaintiff did not possess. While the court is concerned that the contemporaneous objection to the upgrading expressed by defendant was not supported by any evidence at trial, the court will accept this as some evidence, sufficient to satisfy defendant's burden of production. The focus then shifts back to plaintiff who must rebut defendant's evidence and prove that reasonable accommodation was not made or that further accommodation would not have created an undue hardship. Since defendant made some accommodation, the court views the issue of whether that accommodation was reasonable under the circumstances as analytically inseparable from the issue of whether additional accommodation could have been made without undue hardship.

Plaintiff holds and seeks a high level position, requiring sophisticated information-gathering and analytical abilities, and the ability to draw conclusions and communicate them persuasively. It cannot be disputed that highly developed oral communication skills are immensely useful in such jobs and possessing them is frequently a significant aid to advancement. Since plaintiff's handicap deprives him of the ability to excel in this area, his advancement would seem to require either that the FDIC allow plaintiff to advance despite his handicap (which would require other employees and third parties to make allowances for plaintiff's handicap in oral speech), or modify the duties of plaintiff's position so that oral communication skills were not as important. The alternative is to accept that a highly competent but profoundly deaf person, who clearly has greater potential than is being utilized, must be satisfied with limited career advancement.

The FDIC has the responsibility under governing regulations to be a model employer of the handicapped. It has an affirmative duty, absent undue hardship, to make such accommodations as job restructuring, so that handicapped individuals have equal job opportunity. Reviewing the history of plaintiff's employment with the FDIC, it is clear to the court that defendant has not fulfilled its statutory and regulatory obligations. Plaintiff tried in vain to succeed in the field, handicapped not as much by his deafness as by his employer's untested fear that his oral communication difficulties would prevent him from performing complex tasks adequately. It is important to note that there is no evidence that his employer was correct. The record contains considerable evidence that other FDIC employees and outside bank officials were consistently willing to make the effort required to communicate effectively with plaintiff and frequently found dealing with plaintiff an extremely positive experience. It appears in addition that the only accommodation that would have been necessary to assuage any concerns about plaintiff's ability to deal with hostile bank officials was assignment of another examiner to work on particularly contentious cases with plaintiff. Since the evidence established that two examiners are routinely assigned to such challenging cases, there is no basis for concluding that this accommodation would have been unduly burdensome. Further, it is not unlikely, from what the court can determine from the evidence, that plaintiff would have been able to handle the situations which gave his supervisors concern, and that the instances in which he needed help would have been few and far between.

Plaintiff's experience with the Assessment Center examination is also significant. Prior to plaintiff's visit to the Assessment Center, Bill Houston, the Assistant Director of the Assessment Center, realized that plaintiff's ability to succeed in the test would be ham-

pered if certain accommodations were not made. He communicated to Paul Fritts a number of suggested modifications. Fritts agreed with "the thrust" of Houston's comments but appears to have deflected any action with his comment, "but how far do we want to go?" Accordingly, no accommodation was made and plaintiff failed the test, due primarily to his handicap. Fritts' only suggestion thereafter was speech therapy and a writing course, all to be closely monitored by plaintiff's supervisor, but the only monitoring was done by someone unknown to plaintiff who appears to have had no understanding of the inherent limitations of plaintiff's speech abilities and who believed erroneously that speech therapy could render plaintiff's speech easily understood. Nevertheless, plaintiff spent a year in speech therapy, trying to satisfy his superiors. When he ultimately concluded that contrary to what he had believed, his supervisor was not monitoring his progress, he told his story to Michael Hovan in Washington, who promptly arranged for plaintiff's promotion. Plaintiff's promotion to commissioned status was thus needlessly delayed for a year due to the FDIC's failure to accommodate his handicap.

While clearly there were conscientious and caring people within the FDIC who were of the view that with modest accommodations plaintiff could succeed, at key moments the dominant attitude appears to have been one of indifference or inaction. Plaintiff could not have known ahead of time what modifications were necessary to allow him to perform well at the Assessment Center, but his employer knew and did nothing. Nor did plaintiff realize as he worked at speech therapy that it was not an effective accommodation because his employer was waiting for an unrealistic level of improvement. When plaintiff came to realize that speech therapy would never lead to his advancement, he sought assistance. After a wasted year, he was promoted. Clearly, the FDIC could have easily accommodated plaintiff by modifying or even waiving the Assessment Center (as it finally did).

Once commissioned, plaintiff found himself busy with routine matters, none of which allowed him to develop the expertise and exposure that would make him a serious contender for a promotion. Plaintiff had to request a detail, realizing himself that he was not advancing in the field. When plaintiff finally got his detail as a banking analyst, he performed well.

Once functioning as a banking analyst, plaintiff, despite his satisfactory performance, found advancement still impossible. When he asked for more challenging work, he was told that he had too much other work to do. When he posted for promotions, he consistently lost out to others with the specialized experience he could have gotten had he been given the opportunities he requested. When his immediate superiors decided that his work justified an upgrade, it was denied for a reason that has not been substantiated. He was finally told that he could advance only if he returned to the field, a course plaintiff reasonably believed was doomed, based on his prior experience. Indeed, any person concerned at all with plaintiff's career would have had to have realized that plaintiff could excel in the field only if efforts were made to ensure that he was not again deprived of challenging assignments because of concerns about his speech.

Further, the FDIC has offered no evidence that it would be difficult to adjust plaintiff's duties so that oral communication would be less important.[9] Indeed, the rejected upgrade request, if granted, would have accomplished that objective without, it appears,

---

**9.** This case is unlike *Fedro v. Reno,* 21 F.3d 1391 (7th Cir.1994), in which the Court of Appeals held that the Marshal's Service was not required to merge part-time jobs to create a full-time job, so that a disabled employee could work full-time at work he was physically capable of performing. From the evidence presented, *see, e.g.,* PX 35, it appears that the FDIC operated flexibly in terms of distributing work and redistributing it among employees to maximize their effectiveness. Further, the FDIC can, and at times does, waive the position posting requirement. Defendant failed to come forward with any evidence that off-site work could not have been distributed to give plaintiff more responsibility for larger and more complex banks. When plaintiff asked for more challenging work, he was consistently told either to be patient or that he was too busy already. He was never told that giving him the work he wanted would have contravened any FDIC policies or procedures or otherwise burdened the FDIC.

causing any hardship for plaintiff's office or coworkers. The FDIC's reason for denying the request is unsatisfactory, since it essentially refuses an accommodation for no reason other than it would contravene the agency's normal position structure.

■ It is well established that an employer is not required to accommodate one employee in a manner that usurps the legitimate rights of other employees. *Jasany v. United States Postal Service,* 755 F.2d 1244, 1251–1252 (6th Cir.1985) (employer not required to reassign plaintiff in violation of collective bargaining agreement). However, this rule does not mean that where a preference is permissible, the employer cannot give the benefit of the preference to a handicapped employee. *See Buckingham v. United States,* 998 F.2d 735, 741 (9th Cir.1993). Merely because an accommodation would require a change in a supposedly neutral standard operating procedure does not render it unreasonable or unduly burdensome. Indeed, "that is the essence of reasonable accommodation." *McWright v. Alexander,* 982 F.2d 222, 227 (7th Cir.1992).

Had the FDIC given plaintiff the more challenging assignments he wanted (first in the field and later off-site), it is possible that no accommodation at all would have been necessary.[10] That is, had plaintiff been treated just as non-handicapped employees were treated, he might have succeeded without accommodation. If accommodation were determined to have been necessary, it would probably have been limited to the not unusual FDIC procedure of assigning a second examiner for complex examinations likely to involve hostile bank directors.[11]

■ In terms of possible accommodations, the evidence demonstrates that there were accommodations available that would not have created any undue burden on the FDIC. Neither a position upgrade for plaintiff, nor a restructuring of his duties and/or modification of his assignments so that he could perform increasingly complex work out of the field and hence establish himself as worthy of promotion, nor giving weightier consideration, in evaluating plaintiff for promotion, to the special experiences he would bring to a new position as a handicapped employee, would have usurped the legitimate rights of other employees or placed any measurable burden on the FDIC.

To meet its burden under the Rehabilitation Act:

> An employer ... may not merely speculate that a suggested accommodation is not feasible. When accommodation is required to enable the employee to perform the essential functions of the job, the employer has a duty to "gather sufficient information from the applicant and qualified experts as needed to determine what accommodations are *necessary* to enable the application to perform the job...."

*Buckingham,* 998 F.2d at 740 (*quoting Mantolete v. Bolger,* 767 F.2d 1416, 1423 (9th Cir.1985) (emphasis in *Mantolete* )).

Many FDIC officials over the years have generously extended themselves on plaintiff's behalf and have helped him move forward. But the agency as a whole has utterly failed in its duty to pay attention to plaintiff's needs and to give thoughtful consideration to how they might be addressed. Plaintiff's superiors' unspoken anxieties about his abili-

---

10. An employer's concern about a client's reaction to an employee's handicap can be a powerful means of perpetuating stereotypes and holding back qualified workers. There is considerable evidence in the record that contrary to the concerns of plaintiff's supervisors, bankers reacted well to plaintiff and were favorably impressed by his abilities and dedication.

11. Because this court has concluded that plaintiff may proceed only under § 501, it need not reach the issue of whether plaintiff was discriminated against. Nevertheless, it clearly appears that plaintiff was treated differently from non-handicapped employees because of his handicap in that he was given less desirable assignments. The record before this court *explains* that discrimination, in that plaintiff's supervisors were afraid his handicap would impair his effectiveness, but it does not *justify* it, inasmuch as there is no evidence that plaintiff's ability to perform effectively was actually impaired by his handicap. As this court views the evidence, even if the FDIC could succeed in demonstrating that the persons promoted over plaintiff were better qualified than plaintiff was, the reason they were better qualified is that they were given better opportunities to develop specialized skills than was plaintiff.

ty to take on more challenging work have made them reluctant to give him the kind of opportunities he needs to advance, and no one, from what the court has seen, has devoted adequate time and energy to trying to determine whether these anxieties are based in reality or not. The court need not decide whether or not the FDIC was legally required to follow the directives of the OPM *Handbook of Job Analysis for Reasonable Accommodation* to conclude that a federal employer cannot satisfy its duty to make reasonable accommodation without making some effort to consider how to provide equal employment opportunity to a handicapped employee, especially when the employee makes clear his desire to advance even as he falls farther and farther behind his peer group.

Plaintiff has adequately proven that he could have been accommodated more meaningfully and effectively, and without undue burden on the FDIC, at numerous junctures in his career. He has also proven that with those accommodations he could have performed the essential functions of his job well and advanced in his career. He has proven that his advancement within the FDIC has been impeded for many years, continuing to the present, because his handicap has not been meaningfully accommodated. Accordingly, judgment on liability should enter in favor of plaintiff and against defendant on plaintiff's § 501 claim.

There remains the issue of remedies, an issue on which the court would appreciate the considered input of the parties. The case shall be set for a status hearing on August 31, 1994, at 10:00 a.m. (or by telephone at 9:55 a.m. if the parties prefer) to set a date for argument on remedies. If plaintiff wishes the court to reconsider its ruling on his § 504 claim, a schedule for reconsideration of that issue will be set at the same time.

DATED: August 24, 1994.